UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEAMSTERS LOCAL 856,<br>　　　　Plaintiff,<br>　　v.<br>DELTA DENTAL OF CALIFORNIA,<br>　　　　Defendant. | Case No. 16-cv-04325-JCS<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 34, 35 |

## I.　INTRODUCTION

In this action, Petitioner Teamsters Local 856 ("Union") seeks an order vacating the arbitration decision that Arbitrator Catherine Harris ("the Arbitrator") issued on April 25, 2016 pursuant to the grievance procedure contained in the collective bargaining agreement ("CBA") between the Union and Respondent Delta Dental of California ("Employer" or "Delta"). Presently before the Court are the parties' cross-motions for summary judgment ("Motions"). A hearing on the Motions was held on November 17, 2017. For the reasons stated below, the Court DENIES the Union's Motion for Summary Judgment ("Plaintiff's Motion") and GRANTS Delta's Motion for Summary Judgment (Defendant's Motion").[1]

## II.　BACKGROUND

### A.　The Parties

The Union is "a labor organization and the exclusive collective bargaining representative of the clerical employees employed by Respondent Delta Dental of California at its facilities located in San Francisco and Rancho Cordova, California, with headquarters located in San

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

Bruno, California." Petition ¶ 2. According to the Petition, Delta is engaged in the business of providing dental insurance benefits and has its headquarters in San Francisco, California. *Id.* ¶ 3.

### B. Relevant Provisions of the Collective Bargaining Agreement

The CBA governs the relationship between Delta and the Union during the relevant period. *See* Declaration of Betsy Johnson in Support of Respondent Delta Dental of California's Motion for Summary Judgment ("Johnson Decl."), Ex. B (CBA), Preamble (stating that CBA came into effect on May 31, 2012 and is "considered renewed from year to year subsequent to the expiration date unless either party hereto gives written notice to the other party of a desire to alter, modify or change" the CBA). The authority of an arbitrator to adjudicate disputes under the CBA is set forth in Section 30, "Adjustment of Grievances," which provides in relevant part:

> c) If the four (4) members of the adjustment board are unable to settle a dispute, either party may request that the unresolved issue be submitted to an arbitrator for final and binding decision. […] The arbitrator shall have no power to add to, delete or modify any terms of this Agreement.

*Id.* at 12.

Section 35(a) of the CBA, entitled "Maintenance of the Bargaining Unit," allows Delta to reduce bargaining unit positions that become vacant, but subsection (b) sets a bargaining unit floor of 375, providing as follows:

> b) The Employer shall not reduce the bargaining unit below 375 for any reason. Any new part-time positions created shall be considered on a full-time equivalent (FTE) basis toward the bargaining unit floor of 375. If the company reaches the negotiated bargaining unit floor of 375, and an event of external major business impact occurs, the parties agree to meet and confer to discuss the effects of such an event on the business, and neither party waives any of its current legal rights.

*Id.* at p. 14. Section 36 of the CBA, "Protection of Work," further provides:

> It is the company's intent to avoid the layoff of bargaining unit employees during the term of the agreement. Therefore, bargaining unit employees shall not be laid off, except where necessary due to circumstances beyond the company's control, as defined herein. *Circumstances beyond the company's control include: significant loss of business accounts, **circumstances outlined in Section 38**, an act of nature, war emergency, government or regulatory action significantly affecting the company or the dental insurance market; provided the circumstance has a **material and substantial impact** on the company.* In the event of such a circumstance

2

> resulting in a material and substantial impact on the company, the company will meet and confer with the Union prior to making the decision to layoff any bargaining unit employees. Nothing in this Section shall be interpreted to contradict the provisions of Section 35, setting forth the bargaining unit floor of 375.

*Id.* (language of particular significance to the parties' dispute highlighted and in bold).

Finally, Section 38 of the CBA, entitled "Automation," provides:

> In the event of a reduction of work force by reason of introduction of new equipment or a change in methods of operations, existing employees shall be retained in such jobs as remain or are created in accordance with their seniority standing.

*Id*. at 15. It is undisputed that the language of Section 38 governing automation has been in the CBA, without change, since "at least 1965 or [1966]." *See* Declaration of Andrew H. Baker in Support of Plaintiff's Motion for Summary Judgment ("Baker Decl."), Ex. E (Arbitration Hearing Transcript, Day Two) at 196.

### C. Negotiation of the Collective Bargaining Agreement

The parties commenced negotiations with respect to he current CBA on November 1, 2013 and held five meetings in connection with the negotiations. Baker Decl., Ex. E (Arbitration Transcript, Day Two) at 175, 179. The individuals who participated in the negotiations on behalf of Delta were: 1) Rick Doering, Delta's senior vice president of human resources, *id*. at 149, 173; 2) Teri Forestieri, Delta's HR director, *id.*at. 149, 232; and 3) Bruce Conhain, who is a labor consultant who served as Delta's primary spokesperson in the negotiations. *Id.* at.149, 175, and 195. The individuals who participated in the negotiations on behalf of the Union are: 1) The Union's vice president, Rudy Gonzalez, who served as the Union's principal spokesperson in the negotiations, *id.*, Ex. D (Arbitration Transcript, Day One) at 21-22; and 2) Sarah Sanford-Smith, an attorney for the Union who drafted many of the proposals and was the official note-taker for the negotiations. *Id*. at 20-21.

A particularly contentious issue in the negotiations related to job protections for Union members. At a negotiation session on November 13, 2013, the Union introduced its initial proposals for the CBA, including one entitled "No Layoffs," providing employee protection from layoffs due to subcontracting and transferring of work, and another, entitled "Minimum Staffing,"

containing a minimum staffing floor of 600 employees. Baker Decl., Ex. G (Union Ex. 1 at p. 5, Union Ex. 2).[2] Delta did not accept these proposals, and at the negotiation session on November 20, 2013 it presented a formal counterproposal to the Union's job protection proposals. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 31-32; *id.*, Ex. G (Union. Ex. 4 at p. 5, and Union Ex. 5). This counterproposal had a structure similar to the Union's job protection proposals, but it re-captioned as "Protection of Work" the clause the Union had captioned "No Layoffs," excluded print shop and commercial data entry jobs from that clause, and, with respect to the "Minimum Staffing" clause, weakened the language proposed by the Union, changing the phrase "The Employer shall not reduce the bargaining unit below 600" to "[t]he Employer does not intend to reduce the bargaining unit below 150." *Id.*

Later during the same meeting, the Union presented a revised proposal related to "Job Protection" in which it introduced a new section, entitled "Maintenance of the Bargaining Unit." Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 36; *id.,* Ex. G (Union Ex.. 4 at p. 7 and Union Ex. 6). That section read, in relevant part, as follows:

> It is the company's intent to avoid the layoff of bargaining unit employees during the term of the agreement. Therefore, bargaining unit employees shall not be laid off, except where necessary due to circumstances beyond the company's control, as defined herein. Circumstances beyond the company's control include: significant loss of business accounts, an act of nature, war emergency, government or regulatory action significantly affecting the company or the dental insurance market; provided the circumstance has a material and substantial impact on the company. In the event of such a circumstance resulting in a material and substantial impact on the company, the company will meet and confer with the Union prior to making the decision to layoff any bargaining unit employees. (Nothing in this Section shall be interpreted to contradict the provisions of B, below.)[3]

Baker Decl., Ex. G (Union Ex. 6). Notes of the negotiations reflect that the Union offered this section in an effort to "be reasonable" and in recognition of the fact that while the Union wanted to "guarantee jobs" "there might be things outside of [the Employer's] control that impact [the]

---

[2] At the arbitration hearing, Ms. Sanford-Smith testified that there were "just under 700" Union members in the "Delta bargaining unit" at the time of the negotiations. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 27.
[3] "B" was the Union's Minimum Staffing proposal.

4

[E]mployer's ability to operate." Baker Decl., Ex. G (Union Ex. 4 at p. 7) (reflecting statements by Union negotiator Rudy Gonzalez about the reason the Union was proposing the new section).

At the same meeting, Delta responded to the Union's proposal, offering a section that was almost identical to the "Maintenance of the Bargaining Unit" section quoted above, except that it added the words "except as otherwise provided for in this agreement" after the word "Therefore" in the second sentence of the section. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at, p. 42; *id.*, Ex. G (Union Ex. 7).

The parties resumed negotiations on November 22, 2013 and at that time discussed the addition of the words "except as otherwise provided for in this agreement." Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 42. According to Sanford-Smith, Union vice president Gonzalez asked why Delta had inserted this language and Delta spokesman Bruce Conhain responded that it was necessary because otherwise, the new section would render "null" the existing Automation provision and Delta "wanted the ability to lay off people" "if some new process or new equipment changed the way they did business." Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 49-50. Sanford-Smith testified that Gonzalez agreed with Conhain's interpretation of the Union version of the provision, that is, that it would prohibit lay-offs due to automation, and further testified that the Union "didn't want any lay-offs." *Id*. at 50. Gonzalez went on to ask for a "hypothetical" to illustrate what Delta "envision[ed]." *Id*. Rick Doering then offered the example of "integrated voice recognition," or "IVR," a technology that would replace telephone operators with robots. *Id*. at 51. According to Sanford-Smith, Doering "said that, hypothetically, this is something that would . . . save millions [of dollars], and it would . . . [result in the loss of] near[ly] 300 jobs." *Id*. When Gonzelez asked if Delta had any plans to introduce such automation, Conhain told him that it did not. *Id*. at 51-52.

Conhain offered similar testimony, testifying that Rick Doering offered the "IVR" example in the context of discussing the "material and substantial" language of the proposed "Maintenance of the Bargaining Unit" section. Baker Decl., Ex. E (Arbitration Hearing Transcript, Day Two) at 215. He further testified that this was the only example the parties discussed and that "other than that, no one ever said, – let's make a list of what's material and what's substantial going forward,

5

other than the telephone example I know of none." *Id*. Doering himself testified that at the November 22, 2013 negotiation session he offered IVR as an example of "the type of automation that could hypothetically happen and have an impact [on] jobs." *Id*. at 191-192. According to Doering he did not, however, "give any examples of how much the upgrade might cost" or "how many jobs might be affected." *Id*. at 192.

Later in the same meeting, the Union presented a revised proposal in which the language discussed above, relating to job protection, was moved out of the "Maintenance of the Bargaining Unit" section into a section entitled "Protection of Work." Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 53-54; *id.*, Ex. G (Union Ex. 9, p. 8 and Union. Ex.13).) This section contained the same language that had been used in the Union's previous two proposals with the exception that it added to the definition of "circumstances beyond the company's control" a reference to the Automation Clause (then Section 36). *Id*. The section did not include the "except as otherwise provided for in this agreement . . . ." language contained in Delta's previous proposal. *Id*. Conhain testified that he had suggested to the Union negotiators that a reference to Section 36 be added to the clause. Baker Decl., Ex. E (Arbitration Hearing Transcript, Day Two) at 210-211.

Delta then presented a counterproposal which accepted the Union's language regarding the Automation clause. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 61; *id.*, Ex. G (Union Ex. 14). The parties signed off on their tentative agreement on the job protection language later in the same meeting. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 61; *id.,* Ex. G (Union Ex. 15).

**D.    Introduction of OPEX 72 in the Rancho Cordova Mail Services Department**

Delta has approximately 76 bargaining unit employees (both full-time and part-time) in the Mail Services division at the Rancho Cordova facility. *Id.* at 78. The Mail Services division consists of the incoming mail room (which employed 67 union members) and the outgoing mail room (which employed 9 union members). *Id*. The parties' dispute relates to the incoming mailroom (hereinafter, "the Mailroom").

The Mailroom processes claims for three divisions: Denti-Cal, Federal and Commercial.

*Id.* at 77. Mail Clerks manually sort all incoming mail between these three divisions and the sorted mail is then distributed on carts by management to each division. Baker Decl., Ex. D (Arbitration Hearing Transcript, Day One) at 97-98. That process was not affected by the new technology discussed below. *Id.* The operators who receive the sorted mail segregate envelopes that contain x-rays, which cannot be scanned (either using the old technology or the new technology). *Id*. at 101-1-2. The remaining mail is then loaded into a hopper and opened by a machine. *Id*. at 99-100. Until 2014, the Mailroom used a machine called the "51 OPEX" to open the mail. *Id*. at 82. In January 2014, however, Delta replaced the 51 OPEX machines used in the commercial division of the Mailroom (but not the machines used in the other two divisions) with OPEX 72 machines. *Id.* at 84.

The OPEX 72 differs from the 51 OPEX in that it can open somewhat thicker envelopes – up to a quarter inch thick as opposed to "thin mail" that was "a little bit less than a quarter inch." *Id.* at 99-100. Once the mail is opened, an operator using the old OPEX machine removes the mail from the envelopes, classifies the mail and routes it to a "bundler"; the bundler counts the number of pages in each bundle, spot checks to make sure the mail in the bundle has been properly classified, and scans the mail. *Id.* at 102-106. In the case of the OPEX 72, the machine opens the envelope and the operator (as before) removes the mail from the envelope. *Id.* Instead of manually classifying the claims, however, an operator using the new machine places the opened mail on a conveyor belt and the OPEX 72 scans and classifies the mail. *Id.* According to mail room manager Francoise Thimon, using the 51 OPEX the process is 98% accurate whereas the process is 99.5% accurate using the OPEX 72. *Id.* at 87-99. Regardless of which machine is used, once the mail is scanned it is put into buckets and carried to the "ballroom" where it is kept for three weeks before being shredded. *Id.* at 107.

Management in the Mail Services Division had been interested in the new OPEX machines as early as 2011, when Francoise Thimon told Mail Services Director Jack Frey about the new technology after receiving a brochure from the OPEX representative about the new machine. *Id.* at 83-84. Frey made the decision to purchase OPEX 72 machines for the commercial division, approving the purchase of nine OPEX 72 machines on August 30, 2013. *Id*. at 91-92. Frey

7

determined that the introduction of the upgraded OPEX machines in the Commercial Division would result in the elimination of fifteen full-time-equivalent jobs in the bargaining unit (9 Mail Clerks, 3 OPEX Operators, and 3 Scanners). *Id.* at 93, 114. Doering testified that he did not learn until mid-December 2013, after the conclusion of the CBA negotiations, that the Mail Services Division was "in the process of purchasing new machinery that would affect the number of positions in the mail room." Baker Decl., Ex. E (Arbitration Hearing Transcript, Day Two) at 185. At that point, Doering instructed HR Director Teri Forestieri to begin meet-and-confer discussions with the Union relating to the effects of the implementation of the new machines. *Id*.

Delta reduced the number of employees in Mail Services by fifteen employees in April 2014. Baker Decl., Ex. H (Employer Ex. C). The Union filed a grievance relating to mail services employees at Rancho Cordova on about May 20, 2014. Johnson Decl., Ex. C. The Union and Delta subsequently agreed to submit the Union's grievance to the Arbitrator for final and binding arbitration pursuant to the grievance-arbitration procedure contained in Section 30 of the CBA.[4]

### E. The Arbitrator's Award

On April 25, 2016, Arbitrator Harris issued her Opinion and Award, rejecting the Union's claim that Delta violated Section 36. Johnson Decl., Ex. D. The Arbitrator began her analysis by addressing the interplay between Sections 36 and 38. *Id.* at 18-19. She found that "the negotiated language of Section 36, when read in conjunction with Section 38, imposes two new restrictions on the Company's right to eliminate jobs where new equipment produces efficiencies leading to the elimination of bargaining unit positions": "the impact of automation must be material and substantial *and* the Company must meet and confer prior to job elimination." *Id*. With respect to the first requirement (the only one that is at issue here), the Arbitrator went on to conclude that the introduction of the OPEX 72 resulted in a "material and substantial impact on the Company" and therefore, that this automation constituted "circumstances beyond the company's control" under

---

[4] In the grievance, the Union raised two challenges to Delta's conduct: 1) that Delta violated Section 36 of the CBA by eliminating positions in the Mailroom; and 2) that Delta violate Section 33 of the CBA by failing to afford affected employees the bumping rights to which they were entitled under that section. *See* Johnson Decl., Ex. D (Arbitrator's Decision) at 3-4. In the arbitration the Union prevailed as to the second issue and Delta does not challenge the Arbitrator's decision on that question. Therefore, the Court addresses only the first issue here.

8

Section 36. *Id*. at 19.

In reaching the conclusion that the introduction of the OPEX 72 had a material and substantial impact on Delta, the Arbitrator reasoned as follows:

> **The impact of the OPEX 72 was material and substantial**
>
> Mail Services Manager Thimon described how the introduction of the new machines has made it possible for the Mail Services Department to process the same amount of mail with 15 less full-time equivalent positions. Indeed, in a business which has been described by Company witnesses as highly competitive, it is highly improbable that the Company would invest in new equipment in order to achieve an insubstantial or less than material improvement in productivity. To the contrary, Thimon's testimony establishes beyond doubt that the new process is far more efficient than the old process. The new process allows employees to open mailing envelopes, extract the contents, scan, classify and count in a single step at a single work station and these tasks are accomplished with a higher standard of accuracy than under the old process. By any standard, this is a substantial and material impact on the Mail Services Department at the Rancho Cordova facility. Since the processing of incoming mail is a critical component of the Company's operations, it must also be found that the introduction of the new machines has had a material and substantial impact on the Company.
>
> The arbitrator's interpretation is further compelled by the new language of Article 36 when viewed in the light of the November 2013 bargaining history. While the term "material and substantial" may be subject to more than one interpretation, there is no persuasive evidence that the parties traded proposals, or reached agreement, as to any definition of the term after this language was first proposed by the Union. Moreover, there is no convincing evidence that the reference to IVR by Doering, in response to a question about automation from the Union, represents a mutual agreement that millions of dollars in savings and elimination of hundreds of jobs is a minimal standard for automation to be considered "material and substantial." The Union's bargaining notes simply do not support the conclusion that this exchange between the parties was for the specific purpose of clarifying the meaning of the term "material and substantial." For all of these reasons, the arbitrator is persuaded that the speed and accuracy of the new process has allowed the Company to move forward with fewer employees at a substantial savings (the wages and benefits of 15 fulltime equivalent positions over an extended period of time) and that, under the circumstances presented here, this change resulted in a substantial and material impact on the Company within the meaning of the Agreement.

*Id.* at 19-20.

### F. Contentions of the Parties

#### 1. The Union

In its summary judgment motion, the Union acknowledges that courts exercise a "nearly unparalleled degree of deference" when reviewing an arbitration award issued pursuant to a

9

1  collective bargaining agreement. Plaintiff's Motion at 11 (quoting *Southwest Regional Council of Carpenters v. Drywall Dynamics, Inc.* ("*Drywall Dynamics*"), 823 F.3d 524, 530 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 829 (2017) (internal citation and quotation omitted)). Nonetheless, they contend, there is a limited exception for cases in which the "award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing her own brand of industrial justice." *Id*. at 12 (quoting *Drywall Dynamics*, 823 F.3d at 530) (internal citation omitted). According to the Union, that exception applies here. *Id*. at 12.

The Union argues that under Ninth Circuit case law, this exception applies "when the award contradicts plain contract language." *Id*. at 13 (citing *Federated Employers of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1264 (9th Cir. 1979); *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983); *UFCW Local 119 v. United Markets*, 784 F.2d 1413, 1415 (9th Cir. 1986)). It further points to a case decided by the Sixth Circuit that "emphasized that arbitration decisions that effectively disregard language contained in the parties' collective bargaining agreement fall into the category of decisions subject to reversal." *Id*. at 14 (quoting *Michigan Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) ("At the same time, we cannot ignore the specter that an arbitration decision could be so 'ignor[ant]' of the contract's 'plain language,' [*United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)], as to make implausible any contention that the arbitrator was construing the contract.").

In this case, the Union contends, the arbitrator's decision contradicts the plain language of the CBA by effectively removing the requirement that jobs may be eliminated due to automation only where the new technology has a "material and substantial impact on the company." *Id*. at 15-16 (citing *Dematic Corp. v. UAW Local 1485*, 635 F. Supp. 2d 662 (W.D. Mich. 2009)). Aside from erring as to the facts in finding that the discussion of IVR during negotiation of the CBA was not related to the "material and substantial" language – an error the Union recognizes is not sufficient to warrant vacateur – the arbitrator's analysis "effectively removed the crucial, restrictive clause" from the CBA, the Union asserts. *Id*. at 16-17. In particular, the Union points to the Arbitrator's reasoning that the change was "material and substantial" because Delta is in a

1  "highly competitive" business and "it is highly improbably that the Company would invest in new
2  equipment in order to achieve an insubstantial or less than material improvement in productivity."
3  *Id*. at 17 (quoting Johnson Decl., Ex. D (Arbitration Award) at 19). Under that logic, the Union
4  argues, *any* change in technology would satisfy the "material and substantial" requirement,
5  rendering the language nugatory. *Id.* The Union further asserts that the Arbitrator dispensed her
6  "own brand of industrial justice" to the extent that her conclusion that Delta would not initiate any
7  changes in automation that did not have a "substantial and material" impact" was based on
8  "nothing more than the Arbitrator's own sense of what constitutes a just result." *Id.* at 17-18.

### 2. Delta

Delta argues in its summary judgment motion that the Arbitrator's award should be upheld because her decision "draw[s] it essence from the CBA," rejecting the Union's contention that the Arbitrator was dispensing her "own brand of industrial justice." Defendant's Summary Judgment Motion at 9-10. According to Delta, so long as an arbitrator "even arguably" interpreted the parties' contract – as it contends the Arbitrator did here – she was acting within the scope of her authority and her conclusions must be upheld. *Id*. at 11(quoting *Oxford Health Plans, LLC v. Sutter*, –U.S. –, 133 S. Ct. 2064, 2068 (2013)). Delta rejects the Union's contention that the Arbitrator "effectively deleted" any language from the CBA, arguing that the Union has "grossly mischaracterized" the Arbitrator's reasoning. *Id*. In particular, Delta challenges the Union's reliance on the Arbitrator's statement that "it is highly improbable that the Company would invest in new equipment in order to achieve an insubstantial or less than material improvement in productivity." *Id*. at 12. Delta contends this statement is not equivalent to a finding that *any* new equipment introduced by Delta will automatically satisfy the "material and substantial" requirement, contrary to the assertion of the Union. *Id*. Delta concludes that the arbitration award must be upheld in light of the Arbitrator's "extensive discussion and application of the specific facts and relevant contract provisions in this case, which explicitly are cited in the Arbitrator's written decision." *Id*. at 13.

11

## III. ANALYSIS

### A. Legal Standards

#### 1. Rule 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) ("Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried."). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

#### 2. Standards Governing Petition to Vacate Arbitration Awards

When reviewing labor arbitration awards, courts "afford a 'nearly unparalleled degree of deference' to the arbitrator's decision." *Drywall Dynamics*, 823 F.3d at 530 (quoting *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers* ("*Stead Motors*"), 886 F.2d 1200, 1204-1205 (9th Cir. 1989)). This high degree of deference is due to "the centrality of the arbitration process to stable collective bargaining relationships," *id.*, as well as the notion that "[s]ince the labor arbitrator is designed to function in essence as the parties' surrogate, [the arbitrator] cannot 'misinterpret' a collective bargaining agreement." *Stead Motors*, 886 F.2d at 1205. Courts are generally prohibited from looking to the merits of the arbitration decision, and "a court should not reject an award on the ground that the arbitrator misread the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.* ("*Misco*"), 484 U.S. 29, 38 (1987) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)).

While highly deferential to labor arbitration awards, courts may vacate these awards when the arbitrator did not properly "look at and construe the contract." *See Drywall Dynamics*, 823 F.3d at 530. In particular, the Ninth Circuit has held that a labor arbitration award is properly vacated under the following circumstances:

> (1) when the award does not draw its essence from the collective bargaining and the arbitrator is dispensing [her] own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to [her]; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

*Id.* (citing *S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792–93 (9th Cir. 2001)).

An arbitration award "draws its essence" from a bargaining agreement "when it is based on language in the CBA." *SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94, Local Lodge 311*, 103 F.3d 923, 925 (9th Cir. 1996) (citing *Stead Motors*, 886 F.2d at 1205 n.6). An arbitration award fails to "draw its essence" from a bargaining agreement when "the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] [her] own brand of industrial justice.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Enter. Wheel*, 363 U.S. at 597). This exception is narrow and courts generally reserve findings that an award failed to draw its essence from a collective bargaining agreement for "those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract [and] manifestly disregarded the contours of the bargain expressed in outline by the collective bargaining agreement." *Stead Motors*, 886 F.2d at 1205 n.6 (internal citations omitted).

"The scope of the arbitrator's authority is limited to the issue submitted to [her] by the parties." *Sunshine Mining Co. v. United Steelworkers of Am., AFL-CIO, CLC*, 823 F.2d 1289, 1294 (9th Cir. 1987) (citing *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 302 (3d Cir. 1982)). In analyzing whether an arbitrator exceeded this authority, the arbitrator's opinion must be upheld if the arbitrator "is even arguably construing or applying the contract and acting within the scope of [her] authority." *Misco*, 484 U.S. at 38. Courts treat arbitrators' interpretations of the scope of the issues submitted to them with "great deference." *Federated*

*Dep't Stores v. United Foods & Commercial Workers Union, Local 1442*, 901 F.2d 1494, 1498 (9th Cir. 1990). "[A]n arbitrator has no authority to ignore the plain language of a collective bargaining agreement that limits the scope" of the arbitrator's authority, however. *Haw. Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1181 (9th Cir. 2001)).

A court may decide whether an arbitrator's award should be vacated on a Rule 12(b)(6) motion, s*ee, e.g., Sprewell v. Golden State Warriors*, 266 F.3d 979, 987 (9th Cir.), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001) (affirming district court's order dismissing a petition to vacate under Rule 12(b)(6) on the basis that the arbitrator's decision drew its essence from the CBA), or on summary judgment. *See, e.g., United Food & Commercial Workers Union v. United Markets*, 784 F.2d 1413 (9th Cir. 1986) (affirming district court's order vacating an arbitration award on summary judgment).

**B. Discussion**

The parties' dispute boils down to one question: whether the Arbitrator's conclusion with respect to her interpretation and application of Section 36 is so untethered from the terms of the CBA that it constitutes her "own brand of industrial justice." The Court concludes that it is not.

In order for her decision to draw its essence from the CBA, the Arbitrator was required to give effect to the plain language of the agreement. *See Misco,* 484 U.S. at 38 (1987) ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract."). Thus, the Ninth Circuit has held that where an arbitrator's award directly conflicts with the express language of the CBA, it is outside the scope of the arbitrator's authority and should be vacated. *See, e.g., Federated Employers of Nevada, Inc. v. Teamsters Local No. 631,* 600 F.2d 1263, 1264 (9th Cir. 1979)(holding that arbitration award was properly vacated where the CBA provided that the arbitrator "must select as his award either the last offer made by the Employers or the last offer made by the Union at the conclusion of negotiation" and the arbitrator adopted instead a modified version of the Union's last offer); *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th

14

Cir. 1983) (holding that arbitrator's award was properly vacated where CBA provided that the company could select Working Foremen without regard to seniority but arbitrator concluded, based on past practice, that an employee could not be demoted from the Working Foreman position due to his long tenure in that position, thus "disregard[ing] a specific contract provision to correct what he perceived as an injustice").

Similarly, an arbitrator who adds a remedy that is not provided for under the CBA and/or ignores a provision limiting remedies to those included in the CBA may be acting outside the scope of her authority such that the award should be vacated. *See United Food & Commercial Workers Union, Local 1119, AFL-CIO v. United Markets, Inc.*, 784 F.2d 1413, 1416 ("*United Markets*") (9th Cir. 1986)(holding that where CBA provided that General Clerk position would "no longer" be available after two violations of a particular provision of the CBA, the arbitrator's award providing that the position would not be eliminated until there had been a *third* violation gave the employer "a 'free bite' . . . that 'add [ed] to' the terms of the agreement—an effect forbidden by Section 18.6 of the main agreement."); *Dematic Corp. v. Int'l Union, United Auto. Aerospace, & Agr. Implement Workers of Am. (UAW)*, 635 F. Supp. 2d 662, 673 (W.D. Mich. 2009) (holding that arbitrator's award was properly vacated where CBA limited post-layoff benefits to three months and also included integration clause and clause prohibiting arbitrator from changing the contract or adding or taking away any provision but arbitrator nonetheless awarded post-layoff benefits after the three-month period based on past practice).

Here, the Arbitrator's conclusions are based on her interpretation of the words "material and substantial" as applied to to the parties' dispute. The Arbitrator's interpretation is based, in part, on her factual finding that the discussion of IVR during negotiations was not related to the "material and substantial" limitation. Given the uncontroverted testimony by two of Delta's own witnesses that the discussion of IVR was aimed at that very limitation, the Court finds the Arbitrator's factual finding to be incorrect and unsupported by the record. Nevertheless, under the highly deferential standard this Court is required to follow, this is not a permissible basis for vacating the Arbitrator's decision. *See Drywall Dynamics*, 823 F.3d at 39 (holding that "improvident, even silly" fact finding is not a basis for vacating an arbitrator's award). Further,

15

the Arbitrator did not ignore this term outright, but instead, offered several reasons for concluding that the limitation was satisfied. While the Court does not find these reasons to be persuasive, it cannot say that the Arbitrator's decision did not draw its essence from the CBA or that the Arbitrator's application of the term contradicted the plain language of the CBA. Rather, this appears to be a case where the Arbitrator simply misread the contract. *Misco*, 484 U.S. at 38 (1987). In light of the extraordinarily deferential standard of review that applies to the Union's petition to vacate the Arbitrator's award, the Court concludes that it must uphold the Arbitrator's award.

## IV. CONCLUSION

For the reasons stated above, the Union's Motions is DENIED and Delta's Motion is GRANTED. The Clerk is instructed to enter judgment in favor of Delta.

**IT IS SO ORDERED.**

Dated: November 26, 2017

JOSEPH C. SPERO
Chief Magistrate Judge